UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


KATHLEEN LEAVEY,                    Case No. 09-11288

            Plaintiff,              SENIOR   UNITED   STATES
                                    DISTRICT JUDGE
v.                                  ARTHUR J. TARNOW

CITY OF DETROIT, ET AL.,            UNITED   STATES   MAGISTRATE
                                    JUDGE
            Defendants.             VIRGINIA M. MORGAN


_____/


**OPINION AND ORDER GRANTING DEFENDANT CITY OF DETROIT'S MOTION FOR SUMMARY JUDGMENT [59] AND DEFENDANT ATKINS' MOTION FOR SUMMARY JUDGMENT [60]**

Before the Court are Defendant City of Detroit's Motion for Summary Judgment [59] and Defendant Atkins' Motion for Summary Judgment [60]. On May 13, 2010, the Court heard oral arguments on the motions.

For the reasons that follow, Defendant City of Detroit's Motion for Summary Judgment and Defendant Atkins' Motion for Summary Judgment are GRANTED.

**I. Procedural background and facts**

The original complaint was filed in this matter on April 7, 2009. A second

amended complaint was filed on November 30, 2009.[1]  The events giving rise to the case transpired in the weeks prior to the mayoral primary election in 2009 and are as follows:  Plaintiff Kathleen Leavey, who is white, was serving as Interim Corporation Counsel for Defendant City of Detroit.  Plaintiff had been appointed to that position by Mayor Kenneth Cockrel, who is African-American.  Plaintiff asserts that in December 2008, she learned of a judgment that an individual, Thomas Sciotti, had won in a reverse discrimination case against the 36th District Court.  Sciotti's attorney was aggressively seeking collection of that judgment. Plaintiff alleges that the City had not previously paid a judgment against the Court and was therefore unprepared when the Court demanded that the City pay Sciotti a six figure sum.  Proper procedures had to be followed before payment was made.

When Plaintiff learned of the judgment, she maintains that she contacted the senior attorney for the 36th District Court, Constance Allen.  Allen had worked on the case for the Court.  Plaintiff was unable to reach Allen at first but ultimately reached Defendant Atkins, Chief Judge of the 36th District Court.  Plaintiff claims that "she informed Judge Atkins that the City would pay the bill but it would have to be paid out of the Court's budget" and "Plaintiff also requested the pleadings *so that she could comply with the City's payment procedures*."  *See* Plaintiff's Response to City's Motion for Summary Judgment at 2 (emphasis added).

---

[1] The second amended complaint has four counts: 1) First Amendment retaliation claim against Defendant Atkins 2) First Amendment retaliation claim against Defendant City of Detroit 3) Reverse race discrimination claim under the Fourteenth Amendment against Defendant City of Detroit 4) Reverse race discrimination claim under the Michigan Elliott-Larsen Civil Rights Act against Defendant City of Detroit.

Plaintiff notes that there was a dispute over which of the City's budgets, the City's general fund or the Court's, the judgment would come out of, with Plaintiff believing that the money was supposed to come out of the Court's budget.

With Sciotti's attorney pursuing the judgment, Defendant Atkins directed Allen to further address the payment issue with Plaintiff and Chief Assistant Corporation Counsel Dennis Mazurek.  Mazurek  worked in the governmental affairs division, which handles issues regarding the 36th District Court.[2]  A telephone conference call was set up for Plaintiff, Mazurek, and Allen on January 14, 2009.  Plaintiff states in her complaint that "[t]he purpose of the conference call was to discuss payment by the City of a judgment in the amount of $424,000.00 against the 36th District Court in the case of *Sciotti v. 36th District Court*."  *See* Amended Complaint at ¶14.  All three participants in the conference call were white.  Defendant Atkins is African-American.

At some point during the call, the conversation deteriorated.  Defendants assert that it was Mazurek who became hostile, while Plaintiff alleges that it was Allen.  Mazurek testified that Allen's position was that the City was responsible for paying the judgment and that it was not necessary to give a copy of the pleadings to Leavey and Mazurek, who were requesting them.  *See* Plaintiff's Response to City's Motion, Exhibit A at 34.  Plaintiff maintains that Allen "became argumentative, defensive, and rude" and attacked her and Mazurek, because she

---

[2]  Plaintiff testified "that issues regarding that court would normally be referred to Dennis."  *See* City's Motion, Exhibit A at 56.  Plaintiff was of course his boss.

was "feeling the repercussions" of the outcome of the *Sciotti* case.  *See* Plaintiff's Response to City's Motion at 2-3.

Plaintiff testified that it was a "very difficult conversation," with Allen talking over them and cutting them off.  *See* City's Motion, Exhibit A at 67-68. Discussion of the *Sciotti* judgment and a request for pleadings ultimately lead to criticism of the Court.  Plaintiff testified that she thought that Mazurek became upset first and "started talking about the part-time court, that kind of stuff" (Mazurek allegedly started criticizing the Court, including talking about how the judges do not take the bench until late in the morning and how they leave early in the afternoon).  *Id.*, Exhibit A at 68.

Plaintiff testified that she "figured [she] better step in and kind of defend [Mazurek] and get off that topic" and "that's the point at which [she] said, 'You know, Connie, you know, people don't have a lot of respect for your court, or they don't– you know, your court *is like a ghetto court*.  You treat people terrible over there.  You know, they wait in lines all day long...'"  *See* City's Motion, Exhibit A at 68[3] (emphasis added).  Plaintiff alleges that when she said this, it was a "non-

---

[3] According to Allen, Plaintiff's statement was that "if the court stopped acting like a ghetto court, the City might be more inclined to pay our bills."  *See* City's Motion, Exhibit E at 21.  Mazurek testified that he "recall[s] her saying something to the effect of if we're not careful, it will become a ghetto court."  *Id.*, Exhibit F at 33, 85.  Regardless of the exact words spoken, everyone is in agreement that the term "ghetto court" was used.

Plaintiff later testified that when Deputy Mayor Green asked her why she made the remark, she told him, "It was— I explained to him reference to the operation of the Court, the fact that people were, I thought, mistreated in that court and were not treated with respect; that people generally don't like to go to the court because it is so disorganized, and the people are rude..."  *See* City's Motion, Exhibit A at 79.

event"[4] and that the conversation continued for a bit more and then concluded.  *Id.*, Exhibit A at 92.  Allen stated that she would try to get the pleadings and would share Plaintiff's and Mazurek's concerns with Defendant Atkins.

Following the conversation, Allen contacted Judge Atkins and informed her of what was said during the call.  Judge Atkins had Allen email her a recollection of the conference call and that email was forwarded by Atkins to Deputy Mayor Saul Green (who is African-American) the same day.  Atkins also called Green and told him that Leavey had referred to the Court as "ghetto."  *See* City's Motion, Exhibit D at 49-50.

Green attempted to contact Plaintiff but could not reach her.  He also informed Mayor Cockrel of the call.  Green ultimately spoke with Plaintiff the morning of the next day after the phone conference, January 15, 2009.  Plaintiff initially stated to Green that she did not recall making the remark but later in the morning informed Green via email at 10:28 a.m. that she did.  In her email, she stated, "I did use the term I have to admit.  This could be damaging to the mayor and the city.  There may be only one solution to all who will want a pound to flesh and that [is] for me to resign and proceed to retirement."  *See* City's Motion, Exhibit I.

Plaintiff eventually came in to her office and read the email Allen sent to Green (Green had forwarded it to her).  She then emailed Green twice indicating

---

[4] Allen testified that she "was speechless" after Plaintiff made her remark.  *See* City's Motion, Exhibit E at 23.

she had read the email and that it was a misrepresentation of the conversation.  She indicated that she was taking back her *offer* to resign.  *See* City's Motion, Exhibits J and K.

Later that day, Plaintiff met with Deputy Mayor Green.  Plaintiff asserts that the focus of the discussion was the "ghetto court" remark.

At some point that day, Judge Atkins sent a letter to Plaintiff, with various city officials copied on it including Mayor Cockrel, Deputy Mayor Green, judges of the 36th District Court, and several city council members.  *See* City's Motion, Exhibit M.  The letter was received that same day and indicated, inter alia, how offended Judge Atkins was with the characterization of the Court as "ghetto." Judge Atkins referred to that depiction as "racist to this court and the entire city" and as "racially charged insults."  *Id.*  Judge Atkins also addressed some of Mazurek's remarks criticizing the Court.  *Id.*  Plaintiff testified that Green called her shortly after their afternoon meeting and told her that she was going to have to resign.  *Id.*, Exhibit A at 97.  Plaintiff sent Green her resignation letter that same day.  *Id.*, Exhibit L.

On January 20, 2009, Plaintiff emailed Mayor Cockrel seeking to rescind her resignation.  *See* City's Motion, Exhibit N.  Approximately a week later, he sent Plaintiff a letter backdated to January 15, 2009 accepting her resignation.  *Id.*, Exhibit O.

Mayor Cockrel later testified that the comment and the discussion "could have negatively impacted and influenced future dealings between the Law

6

Department and the City of Detroit in general, not only with the 36th District Court but which would also have affected the credibility of the Law Department and the head of the Law Department in dealings with the City Council, that was my concern." *See* City's Motion, Exhibit B at 17.

After her resignation, Plaintiff returned to her former civil service position with the City. *See* City's Motion, Exhibit A at 106.

Following the filing of this lawsuit, Defendant Atkins and the 36th District Court (originally a defendant) filed a motion to dismiss. Following a hearing on July 7, 2009, this Court ruled that the 36th District Court was entitled to immunity and dismissed it from this suit. The Court also ruled that the suit could not be brought against Defendant Atkins in her official capacity but could proceed against her in her individual capacity. Finally, the Court dismissed Plaintiff's claim for retaliatory defamation and denied Defendant Atkins' assertion of qualified immunity without prejudice.

On January 22, 2010, Defendant City of Detroit filed the instant Motion for Summary Judgment [59] and Defendant Atkins filed her Motion for Summary Judgment [60]. Plaintiff filed responses to both motions [61 and 62] on February 11, 2010. Defendant City of Detroit filed a reply [64] on February 18, 2010.[5]

## II. Standard of Review

---

[5] Following the hearing, Defendant City of Detroit filed a supplemental brief [67] on May 24, 2010 in support of its Motion for Summary Judgment. The Court declines to consider it in reaching its decision. However, even if the Court were to consider it, the discussion contained therein does not in any way alter the outcome of this case.

A summary judgment finding is appropriate under Fed R. Civ. P. 56(c)(2) where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that movant is entitled to judgment as a matter of law."  In making its determination, the court "must assume the truth of the non-moving party's evidence and construe all inferences from that evidence in the light most favorable to the non-moving party."  *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).  A moving party "bears the initial responsibility of informing the district court of the basis for its motion"; this burden "may be discharged by 'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-325 (1986).  The non-moving party will not prevail simply because of "[t]he mere existence of a scintilla of evidence in support of" his or her claim; rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The burden then shifts to the non-moving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts"; the party must "come forward with 'specific facts showing that there is a genuine issue for trial.'"  *See Matsushita Elec. Indus. Co., Ltd., et al. v. Zenith Radio Corp., et al.,* 475 U.S. 574, 587 (1986) (citing *FRCP Rule 56(e)*).  Summary judgment is appropriate "[i]f the evidence is merely colorable, or is not significantly probative...." *See Anderson*, 477 U.S. at 249-250 (citations omitted).

## III. Analysis

### A.  Count II of Complaint- First Amendment Retaliation claim against Defendant City of Detroit

Plaintiff alleges that she engaged in protected activity under the First Amendment when she spoke on a matter of public concern—  The dysfunctional operation of the 36th District Court.  *See* Plaintiff's Second Amended Complaint at ¶53.[6]  After Defendant Atkins took offense to her speech, Plaintiff alleges that the City took an adverse action against her by requiring her to resign from her position as Interim Corporation Counsel.  Plaintiff alleges that her protected criticism of the Court was the cause of the City forcing her to resign, which in her view makes out a First Amendment claim.

Defendant argues that under the Supreme Court's ruling in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), Plaintiff's First Amendment claim should be dismissed.

This Court finds that *Garcetti* controls the outcome of Plaintiff's First Amendment claim against the City.  In *Garcetti*, the Court, relying on *Pickering v. Board of Education,* 391 U.S. 563 (1968), and its progeny, addressed the proper inquiries that guide First Amendment analysis for public employee speech.  A court is to look at:

whether the employee spoke as a citizen as a matter of public concern.

---

[6] Plaintiff does not assert in her complaint that the discussion of the *Sciotti* judgment constituted protected speech.  Counsel for Plaintiff also maintained during oral argument on Defendant's motion that he was *not* arguing that discussion about the judgment was protected under the First Amendment.

> If the answer is no, the employee has no *First Amendment* cause of action based on his or her employer's reaction to the speech.  If the answer is yes, then the possibility of a *First Amendment* claim arises.  The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.  This consideration reflects the importance of the relationship between the speaker's expressions and employment.  A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations.

*See Garcetti*, 547 U.S. at 418 (citations and internal quotation marks omitted).

The Court went on to "hold that when public employees make statements pursuant to their official duties, the employees are not speaking as *citizens* for *First Amendment* purposes, and the Constitution does not insulate their communications from employer discipline." *Id*. at 421.[7]  In defining the scope of an employee's official duties, the Court noted that:

> [t]he proper inquiry is a practical one.  Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job

---

[7] In *Garcetti*, an assistant district attorney (ADA) had written a memo to his supervisors about inaccuracies in an affidavit used to obtain a search warrant and recommended dismissal of the case.  *See Garcetti* at 414.  The supervisors met with him in a meeting that ultimately became heated.  *Id*.  Despite the ADA's concerns, the supervisor decided to proceed with the prosecution.  *Id*.  At a hearing on the motion to challenge the warrant, the ADA was called by the defense and discussed his observations of the warrant.  *Id*. at 414-415.  Afterwards, he claimed he was reassigned, transferred to another courthouse, and denied a promotion.  *Id*. at 415.

The Court concluded that the ADA did not act as a citizen in making his speech but rather was acting as a government employee pursuant to his official duties.  *Id*. at 422.  Therefore, his speech was not protected by the First Amendment.

description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for *First Amendment purposes*.

*Id.* at 424-425.

Thus, the question this Court is presented with is whether Plaintiff's remarks were made pursuant to her official duties.

The Court finds that Plaintiff's own complaint and testimony demonstrate that she was indeed acting within her official duties when the comments were made. The conference call was made as part of Plaintiff's job. Plaintiff's Second Amended Complaint states, "The purpose of the conference call was to discuss payment by the City of a judgment in the amount of $424,000.00 against the 36th District Court in the case of *Sciotti v. 36th District Court*." *See* Plaintiff's Second Amended Complaint at ¶14. Plaintiff states in her deposition testimony that she "*was doing what my job required*, which was to talk about a judgment, find out what had happened and relay that to Mr. Green." *See* City's Motion, Exhibit A at 144 (emphasis added). Plaintiff goes on to testify that she "was concerned about... the fact that there was a judgment hanging out there that had not been paid, and I was concerned that this gentleman [Sciotti's attorney] was taking a lot of bizarre action to, you know, satisfy the judgment. And we needed to clean this up. *That's the whole reason for having the conversation is we had to make a decision one way*

11

*or the other*." *Id.,* Exhibit A at 145 (emphasis added). She also testified that "*my job was to gather the information* for the Mayor's office to make the decision." *Id*., Exhibit A at 145 (emphasis added).

Plaintiff cannot now reasonably argue that this conference call and the speech in it were not made pursuant to her official duties. This was not a personal phone call but rather was a business call. Even if the conversation regarding the *Sciotti* judgment ultimately deteriorated and segued into negative comments, including the "ghetto court" statement, being made about the 36th District Court, that does not change the fact that this was an official phone call and that the call and its subject matter were pursuant to Plaintiff's official duties as Interim Corporation Counsel. This Court rejects Plaintiff's claim that she was acting as Interim Corporation Counsel at the beginning of the call when the parties were discussing payment of the *Sciotti* judgment and what budget it should come out of and then suddenly turned into a private citizen criticizing the Court when she decided to make the "ghetto court" remark, a comment which, in Plaintiff's own words, was more of an insult directed at Allen than the statements of a concerned citizen. Plaintiff testified that when Deputy Mayor Green asked her why she made the "ghetto court" remark, her response to him was, "I explained to him that the conversation had gotten heated, that it was a way of me trying to, you know, *just*

12

*lobby back an insult to her*, I think." *See* City's Motion, Exhibit A at 79 (emphasis added).

Plaintiff thus "was acting as a public employee carrying out [her] professional responsibilities" when she made her remarks. *See Haynes v. City of Circleville*, 474 F.3d 357, 364 (6th Cir. 2007); *see also Weisbarth v. Geauga Park District, et al.*, 499 F.3d 538, 544 (6th Cir. 2007) (Court, quoting *Garcetti*, finds that Plaintiff's speech "'owes its existence to [her] professional responsibilities'").

In her brief, Plaintiff claims that her position did not allow her to criticize the 36th District Court and that her speech does not reflect any "special knowledge" she gained as a result of her official position, thus distinguishing this case from the various cases Defendant cited that rely on *Garcetti* in finding that speech was not protected because it was made pursuant to official duties. However, *Garcetti* does not address "special knowledge" of the speaker; rather, the focus is on official duties and whether a statement is made pursuant to those duties. Plaintiff offers no cases that show that the *Garcetti* standard does not apply here.

Plaintiff also states in her brief that *Garcetti* holds that if speech has "any relevant analogue to speech by citizens who are not government employees," then it was not made pursuant to official duties. *See* Plaintiff's Response to City's Motion at 17.  What the Court in *Garcetti* actually said though was that based on

13

prior precedent, "[e]mployees who make public statements outside the course of performing their official duties retain some possibility of *First Amendment* protection because that is the kind of activity engaged in by citizens who do not work for the government.  The same goes for writing a letter to a local newspaper or discussing politics with a co-worker."  *See Garcetti*, 547 U.S. at 423-424 (citations omitted).  However, in the case at bar, the statements were clearly made in the course of Plaintiff performing her official duties.

Finally, Plaintiff argues that this case involves speech that is different from that in *Garcetti* because the speech in *Garcetti* was made *internally* to supervisors, whereas the remarks here were made *externally* to non-supervisors.  However, regardless of whether the speech was made to a supervisor, it was made pursuant to Plaintiff's official duties as Interim Corporation Counsel.  Even if this distinction between internal and external speech existed,[8] the statement was made on a business phone call discussing official business.  Regardless of whether the remarks were to a supervisor, the conversation was pursuant to Plaintiff's official duties.

Accordingly, Defendant City of Detroit is granted summary judgment on

---

[8] *Garcetti* does not state that such a distinction exists.

14

Plaintiff's First Amendment claim.[9]

**B. Count I of Complaint- First Amendment Retaliation claim against Defendant Atkins**

As noted above, Plaintiff's second amended complaint alleges that she was engaged in protected activity under the First Amendment by speaking as a citizen on a matter of public concern, i.e., the dysfunctional operation of the 36th District Court. *See* Complaint at ¶43. Plaintiff alleges that Defendant Atkins retaliated against her after she exercised her free speech rights by forwarding Allen's email about what was said on the conference call to Deputy Mayor Green and then sending Plaintiff the January 15, 2009 letter discussed above (and copying Mayor Cockrel, Green, city council members, and others). Plaintiff alleges that Atkins' attack on her would deter a person of ordinary firmness from continuing to engage in protected conduct. *Id*. at ¶47.

First Amendment retaliation claims are often brought against an employer, including here where Plaintiff alleges that she engaged in free speech and then Defendant City of Detroit retaliated against her by forcing her to resign. However, Defendant Atkins is not Plaintiff's employer.

_____

[9] Since this Court is granting Defendant's summary judgment motion on the above grounds, the Court declines to address the other elements of Plaintiff's First Amendment retaliation claim against the City.

15

If the standard regarding free speech set forth in *Garcetti* was applied to Plaintiff's claims against Judge Atkins, then Defendant Atkins' motion would be granted. The same analysis applied above to the free speech claim brought against the City of Detroit would apply to the claim brought against Atkins as well. Since Plaintiff's speech was pursuant to her official duties, it would not be protected by the First Amendment.

However, Plaintiff argues that the holding of *Garcetti* does not apply here. According to Plaintiff, the rationale for *Garcetti* is that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *See Garcetti*, 547 U.S. at 421-422. Plaintiff argues that this rationale does not apply to Defendant Atkins since she is not Plaintiff's employer.

Although the Sixth Circuit has not addressed this question, Plaintiff points to a district court case from Illinois, *Lewis v. Mills*, 2009 WL 3669745 at *5 (C.D. Ill. 2009), which held "that the government's needs *as an employer* should not insulate the actions of state actors who do not have an employment relationship with a

public employee asserting a First Amendment violation."[10]

Defendant Atkins' brief offers no argument as to why *Garcetti* should apply

to the analysis of Plaintiff's claims against her as a non-employer.

This Court agrees with Plaintiff that the holding of *Garcetti* should not be

applied in analyzing a First Amendment claim against a non-employer.  That

means that the Court must examine whether Plaintiff's speech raised an issue of

public concern.

Three elements must be established in order to set forth a First Amendment

retaliation claim:

> (1) the plaintiff engaged in protected conduct; (2) an adverse action
> was taken against the plaintiff that would deter a person of ordinary
> firmness from continuing to engage in that conduct; and (3) there is a
> causal connection between elements one and two – that is, the adverse
> action was motivated at least in part by the plaintiff's protected
> conduct.

*See Thaddeus-X, et al. v. Blatter, et al.*, 175 F.3d 378, 394 (6th Cir. 1999).

In determining whether the speech is a protected activity, the court must

determine whether it involves a "matter of public concern."  This determination "is

---

[10] The Seventh Circuit discussed the issue of *Garcetti's* applicability to non-employers in
*Fairley, et al., v. Andrews*, 578 F.3d 518, 524 (7th Cir. 2009), but reserved ruling on whether
*Garcetti* "applies to punishments meted out by non-employers."

a question of law for the court." *See Farhart v. Jopke, et al.*, 370 F.3d 580, 589
(6th Cir. 2004). The Sixth Circuit in *Farhart* noted that in reaching this
conclusion, "the court must determine: the 'focus' of the speech; 'the point of the
speech in question'; 'to what purpose the employee spoke'; 'the intent of the
speech'; or 'the communicative purpose of the speaker.'" *Id*. at 592 (citations
omitted). Furthermore, the Court, citing *Connick v. Myers*, 461 U.S. 138, 147-148
(1983), stated that "'whether an employee's speech addresses a matter of public
concern must be determined by the *content*, *form, and context of a given statement,
as revealed by the whole record.*'" *See Farhart*, 370 F.3d at 589 (emphasis added).
Finally, the Sixth Circuit has "held that the proper inquiry is *not* what might be
'incidentally conveyed' by the speech, and that 'passing' or 'fleeting' references to
an arguably public matter do not elevate the speech to a matter of 'public concern'
where the 'focus' or 'point' of the speech advances only a private interest." *Id.* at
592-593 (citations omitted) (emphasis in original).

Taking into account the above considerations, this Court holds that Plaintiff
has not established that the speech at issue raised a matter of public concern; thus,
it is not entitled to First Amendment protection.

Plaintiff has clearly delineated what speech she believes the First
Amendment protects. As noted above, Plaintiff's second amended complaint does

18

not state that the discussion regarding what budget the *Sciotti* judgment should be paid out of was a matter of public concern or that Plaintiff was acting as a "citizen" and not pursuant to official business when the call was initiated.  Moreover, counsel for Plaintiff conceded at oral argument that this part of the conversation did not raise a matter of public concern.  Rather, Plaintiff's complaint states in no uncertain terms that she "engaged in protected activity under the First Amendment by speaking as a citizen on a matter of public concern, i.e. the dysfunctional operation of the 36th District Court."  *See* Complaint at ¶43.  Her response to Defendant Atkins' motion states that "the efficient operation of a public institution is clearly a matter of public concern."  *See* Plaintiff's Response to Defendant Atkins' Motion at 13.

In theory, speech regarding a court's operation could raise a matter of public concern.[11]  Where Plaintiff's argument fails, however, is that she seeks to ignore the holding of *Farhart* and look only at a few of the words spoken in the conference call and not the "focus" of the speech in question or the "context" in

---

[11] Plaintiff only cites one case, *Chappel v. Montgomery County Fire Protection District No. 1*, 131 F.3d 564 (6th Cir. 1997) in support of her argument that the speech at issue is a matter of public concern.  *See* Plaintiff's Response to Defendant Atkins' Motion at 12.  In *Chappel,* the Court found that the speech at issue dealt with matters of public concern, including "matters of public safety," "the gross mismanagement and misappropriation of public monies," "implementation of a paramedic service," and the need for improved training.  *Id*. at 578.

which it was spoken.  Plaintiff was not writing a letter to a newspaper voicing her

concerns about the 36th District Court and the way that it treats people.  Plaintiff

also was not speaking out at a public forum.[12]  Rather, the context in which the

words were spoken was during a business call during business hours pursuant to

official business.  As detailed above in the examination of the City's liability, the

purpose and focus of the conference call was discussion of the *Sciotti* judgment

and which budget payment should be made from.  Plaintiff does not claim that this

portion of the conversation was a matter of public concern.

The criticism of the Court was incidental to that discussion.  Plaintiff herself

admitted that in her deposition testimony.  As noted above— When asked by

counsel what Deputy Mayor Green had asked her about the conversation, she

testified, "He asked me why I said that [the ghetto court remark].  I explained to

him that the conversation had gotten heated; *that it was a way of me trying to, you*

*know, just lobby back an insult to her, I think*."  *See* City's Motion, Exhibit A at 79

(emphasis added).  Plaintiff cannot reasonably claim now that she was acting as a

concerned citizen when she made her remarks about the Court.  She cannot pick

---

[12]  There is no evidence that Plaintiff ever previously addressed the dysfunctional nature
of the Court or made public remarks trying to remedy whatever problems were occurring there.
At oral argument, counsel for Plaintiff was unaware of Plaintiff ever previously raising concerns
about the 36th District Court.

and choose portions of the speech without addressing the context and focus of the entirety of the speech.[13]

Since Plaintiff has not established a constitutional violation, Defendant Atkins is entitled to qualified immunity.[14]  Accordingly, Defendant Atkins' Motion for Summary Judgment should be granted.[15]

### C. Counts III and IV of Complaint- Reverse racial discrimination claims (federal and state) against City of Detroit

Plaintiff claims that she was ordered to resign because she used the term "ghetto" in describing the Court and that she would not have been demoted if she

---

[13] *See Schorfhaar v. McGinnis*, *et al.*, 2000 U.S. App. LEXIS 16219 at *14-15 (6th Cir. 2000) (unpublished) (Plaintiff, an assistant manager at MDOC's Office of Fire Safety, alleged he was denied a promotion in retaliation for expressing concern at an internal meeting not open to the public about the potential for liability due to the lack of certain equipment in the prisons; Court ruled that the speech was not a matter of public concern, as Plaintiff "was speaking in an internal office setting only about matters concerning his duties as an employee– i.e., he spoke at an internal meeting concerning the reinstallation of the SCBA equipment, which was clearly a matter encompassed within his job duties. [He] concedes he never contacted the press or the public, and that at all times his complaints remained an internal matter.  Although [he] appeared concerned about the installation of SCBA equipment, and particularly about the inconvenience and cost of doing so, [his] references to code violations were not his central concerns").

*See also Barnes, et al. v. McDowell*, 848 F.2d 725,734 (6th Cir. 1998) ("The mere fact that public monies and government efficiency are related to the subject of a public employee's speech do not, by themselves, qualify that speech as being addressed to a matter of public concern").

[14] In order to overcome qualified immunity, Plaintiff must demonstrate the violation of a clearly established constitutional right.

[15] Since the Court finds that the speech did not raise a matter of public concern, it is unnecessary to make findings regarding the other elements of Plaintiff's retaliation claim.

was African-American.  *See* Complaint at ¶61-63.

A party alleging reverse racial discrimination by his/her employer must make a four part showing in order to establish a *prima facie* case of discrimination. Plaintiff must establish: 1) that "background circumstances exist to support the suspicion that the defendant is the unusual employer that discriminates against the majority"; 2) that Plaintiff "was qualified for the position"; 3) that Plaintiff "suffered an adverse employment action"; 4) that Plaintiff was "treated differently than similarly situated non-protected employees."[16]  *See Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008) (citations and internal quotation marks omitted).

Once Plaintiff establishes the *prima facie* case, the burden then shifts to Defendant to offer a legitimate, non-discriminatory reason for the adverse employment action.  *See Sutherland v. Michigan Dept. of Treasury*, 344 F.3d 603, 614-615 (6th Cir. 2003).  If Defendant meets this burden, then the burden of production shifts back to Plaintiff to demonstrate that the proffered reason is a pretext for unlawful reverse racial discrimination.  *Id.* at 615.

---

[16] The same test applies to both the federal discrimination claim and the discrimination claim under the Michigan Elliott-Larsen Civil Rights Act, except that under Michigan law, a plaintiff alleging reverse racial discrimination no longer must satisfy the "background circumstances" prong.  *See Lind v. City of Battle Creek*, 470 Mich. 230, 233 (2004); *see also Howell v. Michigan Dept. of Corrections*, 2007 U.S. LEXIS 66193 at *38-39 (E.D. Mich. 2007).

Although Plaintiff satisfies the first three prongs of a *prima facie* case, she fails to make a showing on the fourth prong.

### 1. Background Circumstances

As noted in *Arendale*, supra, "Recent Sixth Circuit precedent suggests, in the context of reverse discrimination claims, that the mere fact that an adverse employment decision was made by a member of a racial minority is sufficient to establish the first prong of the *prima facie* case." *Id.*, 519 F.3d at 603 (citing *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 257 (6th Cir. 2002)).

Here, the parties that made the decision to force Plaintiff to resign were Mayor Cockrel and Deputy Mayor Saul Green.  Both are African-American. Plaintiff has satisfied this prong of the *prima facie* case.

### 2. Qualifications

Defendant does not contest in its brief that Plaintiff has satisfied this prong-Plaintiff was qualified for the Interim Corporation Counsel position.

### 3. Adverse Action

Defendant argues that there was no adverse action here, as a resignation does not constitute an adverse employment action.  Defendant further maintains that its failure to allow Plaintiff to rescind her resignation would also not qualify as an

adverse employment action.

Defendant misunderstands Plaintiff's claim.  Plaintiff is claiming that she was *forced* to resign, which could constitute an adverse employment action.  *See Balmer v. HCA, et al.*, 423 F.3d 606, 615 (6th Cir. 2005) (Court notes that "the only legally cognizable adverse employment action identified by [Plaintiff] is her allegedly forced resignation or constructive discharge").   Furthermore, to the extent that Defendant argues that Plaintiff's January 15, 2009 email to Deputy Mayor Green constituted a resignation that is not an adverse employment action, it cannot conclusively be stated for purposes of this motion that the email was a resignation, rather than an offer to resign.  Plaintiff says in the email that "[t]here may be only one solution... and that [is] for me to resign and proceed to retirement."  *See* City's Motion, Exhibit I.  She does not state that she *is* resigning.

Plaintiff satisfies this prong.

**4. Similarly situated**

Plaintiff must show that she was treated differently than similarly situated minority employees to satisfy the fourth prong.

In her response to Defendant City's motion, Plaintiff does not even attempt to argue that she can make this showing.  At the hearing on May 13, 2010, counsel

for Plaintiff conceded that if Plaintiff were required to satisfy this prong in this form, she would be unable to do so.[17]  Rather, Plaintiff asserts that she does not need to make the above showing on the fourth prong of the test.  Instead, she claims she can satisfy the fourth prong by showing that she was replaced by an African-American or by showing a pattern and practice of discrimination.  Plaintiff claims that she has shown that she was replaced by an African-American and therefore has satisfied this prong of the *prima facie* case.

Plaintiff is mistaken.  The cases Plaintiff cites in support of her argument that she does not have to show that she was treated differently than similarly situated minority employees are not applicable here.  The Sixth Circuit cases cited, *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241 (6th Cir. 1995), and *Clayton v. Meijer, Inc.*, 281 F.3d 605 (6th Cir. 2002)*,* are not *reverse* race discrimination cases, nor is the Michigan state case cited, *Hazle v. Ford Motor Co., et al.*, 464 Mich. 456 (Mich. 2001); therefore, a different test applies.  Plaintiff ignores Sixth

---

[17] In *Arendale*, the Court discussed the meaning of "similarly situated," stating that:

> [s]uperficial similarities between a disciplined employee and his colleagues are not sufficient to show a *prima facie* case of discrimination. [W]hile the plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered similarly situated;... the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the *relevant* aspects.

*Id.*, 519 F.3d at 604 (citation and internal quotation marks omitted).

Circuit precedent requiring that a party demonstrate that an employer treated a similarly situated employee who was not white differently.  *See Sutherland*, 344 F.3d at 614 (Court notes that the Sixth Circuit has adopted the analytical framework governing Title VII claims of discrimination by whites against minorities to claims involving reverse racial discrimination; Court states that to satisfy the fourth prong, "the plaintiff *must* show that the defendant treated differently employees who were similarly situated but were not members of the protected class") (emphasis added); *see also Arendale*, 419 F.3d at 603 (Sixth Circuit again finds in reverse racial discrimination case that the "[p]laintiff *must* show that the City treated differently similarly situated employees of a different race") (emphasis added).[18]

Plaintiff is thus unable to make out a *prima facie* case of reverse racial discrimination.  Accordingly, Defendant City of Detroit is granted summary judgment on this claim.

**IV. Conclusion**

Based on the above findings, **IT IS HEREBY ORDERED** that Defendant

---

[18] Additionally, the district court case Plaintiff cites, *Herendeen v. Michigan State Police, et al.*, 39 F.Supp.2d 899 (W.D. Mich. 1999) was decided in 1999, which is prior to the Sixth Circuit's rulings in *Sutherland* and *Arendale*.

City of Detroit's Motion for Summary Judgment [59] is **GRANTED**.

      **IT IS FURTHER ORDERED** that Defendant Atkins' Motion for Summary

Judgment [60] is **GRANTED**.

      Plaintiff's complaint is hereby dismissed.

      **SO ORDERED.**


      S/ARTHUR J. TARNOW
      Arthur J. Tarnow
      Senior United States District Judge

Dated:  June 24, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of
record on June 24, 2010, by electronic and/or ordinary mail.


      S/LISA M. WARE
      Case Manager